IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1214-11






JASON THAD PAYNE, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE TWELFTH COURT OF APPEALS


WOOD COUNTY





 Keasler, J., delivered the opinion of the Court, in which Keller, P.J, Price,
Womack, Johnson, Hervey, Cochran, and Alcala, JJ., join. Cochran, J., filed a
concurring opinion. Meyers, J., filed a dissenting opinion.


O P I N I O N


 In an unpublished opinion, the Twelfth Court of Appeals held that Jason Payne's
capital murder conviction was supported by legally sufficient evidence, and that several
erroneously admitted victim statements were harmless. (1) While we agree the evidence was
legally sufficient to support Payne's conviction, we remand this case for a new trial because
the court of appeals erred in concluding that the admission of the statements was harmless. I. Factual and Procedural Background

 At 9:09 a.m. on December 11, 2007, Payne called 911 from his house, told the
operator that his wife and step-son had been shot and requested help. The Wood County
Sheriff's Deputies who responded encountered Payne with his daughter standing on the
driveway leading to his house. Upon searching the house, Lieutenant Miles Tucker found
Payne's wife, Nichole, lying dead in her bed with a gunshot wound to her head. He noticed
the strong smell of gunpowder in the room, and that Nichole's body was warm to the touch. 
Lt. Tucker subsequently found Payne's teenage stepson, Austin Taylor Wage, (2) dead in his
bedroom. He had been shot in the face--and based on Lt. Tucker's observation of the
stippling on Austin's face--at relatively close range. Austin's cold, stiff body was found
lying back on his bed, with his feet on the floor, and a rifle standing upright between his legs. 
Lt. Tucker did not smell gunpowder in Austin's room, nor did he observe blood or brain
matter on the ceiling or wall in Austin's room as he did where Nichole was found. 

 No signs of struggle or forced entry into the home were noticed at the scene. A shell
casing, which was forensically determined to have been fired from the rifle resting against
Austin, was found on the floor of Austin's room near his body. Another was located in the
rifle. A badly mutilated projectile was found upon removal of Austin's body. The projectile
was unable to be forensically analyzed, but was consistent with the rifle's gauge. The
officers also discovered clothes, including a man's coat, in the clothes dryer which were still
warm when they searched the scene. The officers also searched Payne's truck parked just
outside the house. There, they found a white wash cloth which contained bright red, fresh
blood. Upon a broader search of the property, officers discovered two large holes in a
wooded area some distance from the house, which witnesses described as resembling graves
that were mechanically or physically dug. However, other than testimony that the holes were
noticed in late November 2007, the State presented no additional evidence concerning the
holes. 

 Later that day, officers interviewed Payne, who denied any involvement in the deaths. 
The interview was video recorded and shown to the jury. He explained to the officers that
he left home with his five-year-old son and his two-year-old daughter around 8:00 a.m,
dropped his son off at school, and then returned home. As he pulled into the driveway, he
claimed he turned around to head into town to get pigeon feed for Nichole's bird business
because they ran out. They made it about half way to town when his daughter said she
wanted to go to the park. Payne stated that, before going to the park, he thought he should
inform Nichole of their plan to do so, and he returned home around 8:15 a.m. But instead
of going inside the house to speak to Nichole, Payne said he and his daughter went to throw
acorns into the creek on their property. After they were done playing by the creek, Payne and
his daughter went to check on the birds. He claimed they then went into the house to ask
Nichole where the bird seed was located when he discovered the bodies of Nichole and
Austin. He did not check to see if either were alive or breathing, nor did he touch them or
try to wake them. He recognized the rifle near Austin's body as his ".30-30" that he kept in
the hall closet. Payne stated he and Nichole had a "fallout" the night before, but claimed that
it was over "little stuff." He maintained that he and Nichole did not have any marital or
financial problems. He acknowledged receiving approximately $300,000 from a personal
injury settlement, though he stated that after seven or eight months very little of it remained.

 Through witness testimony and documentary evidence, the State attempted to show
the Paynes' poor financial situation. With the settlement proceeds, the Paynes made
substantial purchases, including a home without a mortgage and three cars. At the time of
Nichole's death, the couple's bank records indicated that their account was overdrawn in
excess of $200. Payne's unemployment due to his injuries and the Paynes' reliance on a
thirteen-percent loan from an attorney caused Nichole to become depressed, for which she
sought medical treatment and was prescribed an anti-depressant. Also, Payne attempted to
sell his fishing boat in a hurried manner. Payne told the buyer that he wanted to sell his boat
in a single day so he could allegedly buy another boat. He sold it for $13,000, which was
$5,000 less than his outstanding loan on the boat. When the buyer returned a few days later
to finish the paperwork necessary for the sale, he did not see any boat on the property. 
Additionally, in the few months before her death, Nicole began sending her ex-husband
postcards telling him that the couple needed money. 

 When Nichole and Payne purchased auto and home insurance, the staff at the
insurance agent's office asked them if they would also like to purchase life insurance. They
were initially interested. In June 2007, a month or so after the solicitation, Nichole and
Payne each applied for individual $250,000 life insurance policies with riders for their
children. However, after the policies' premiums were calculated approximately fifteen
percent higher than previously quoted for Nichole and significantly higher for Payne, the
Paynes chose only to secure a $100,000 life insurance policy for Nichole with $10,000 riders
for the children which named Jason Payne as the primary beneficiary. Following the deaths
of Nichole and Austin, the insurance agent submitted a claim to State Farm on his own
initiative. When asked to give a recorded statement about the deaths, Payne refused and was
consequently unable to collect on the policy. 

 The jury also heard testimony that Nichole and Payne's marriage was not a happy one. 
Nichole's father testified that Payne did not want Nichole to have contact with her family. 
Nichole's ex-boyfriend testified that Nichole called him approximately two months before
her death and expressed that her marriage caused her to be "as unhappy as she ever had been
in her life" and that she was planning on getting a divorce. Sarah Hawthorne, Nichole's
sister-in-law and best friend, recalled discussing the marital relationship with her in August
2007. Nichole told her that she wanted a divorce and that Payne had threatened to burn her
alive in the house. According to Hawthorne, Nichole was upset and "begged me . . . to
avenge her if something happened to her." After the visit, Hawthorne and Nichole frequently
spoke about Nichole's relationship with Payne. At times, Nichole would call Hawthorne
from the closet or from the back of their property, away from their house. Hawthorne last
spoke to Nichole the night before her death. Nichole was upset, and again repeated that she
wanted a divorce and that Payne had threatened to kill her. 

 The forensic testing on the recovered items at the scene did not affirmatively establish
the perpetrator's identity. No identifiable finger prints or smudges were found on the rifle
or the shell casings. No blood was found on the clothes collected from the dryer. According
to the forensic expert, machine washing does not typically remove all forensically detectable
blood. Although no gunshot residue was detected on Payne's hands, residue was detected
on the back of Nichole's left hand and a single particle was detected on the back of Austin's
right hand. DNA testing confirmed that the blood found on the wash cloth was Nichole's
and the clothes Austin was wearing contained only his blood, not Nichole's. 

 Dr. Keith Pinckard, the medical examiner who performed the autopsy on Nichole's
body and supervised Austin's autopsy, testified that Nichole's cause of death was a gunshot
wound to the back of the head. The gaping exit wound was consistent with that caused by
a high-powered rifle fired at close range. The manner of death was identified as homicide
or, as described by Dr. Pinckard, "death by the hands of another." Dr. Pinckard testified that
Austin's cause of death was a gunshot wound to the face, with the entry point being his upper
lip and the exit wound located on the back of his head toward the right side. The path of the
bullet was front to back, upwards, and slightly left to right. The presence of soot and
stippling on Austin's face indicated that the gun was fired at a relatively close range. Dr.
Pinckard listed Austin's manner of death as undetermined because the nature of the wound
and the estimated range of fire raised the question of whether it would have been possible
for Austin to position and fire the rifle himself. Noting the intermediate range from which
the wound was inflicted, Dr. Pinckard could not rule out suicide. 

 Whether Austin shot Nichole and then committed suicide was a significant defensive
issue at trial. More specifically, the issue evolved into whether it was physically possible for
Austin to have committed suicide using the rifle found at the scene. The State introduced the
testimony of several witnesses who attested to Austin's reputation for being peaceful and
nonviolent. But both sides devoted considerable expert testimony to the subject, with each
party's experts contesting the opposing experts' testing protocols and ultimate conclusions. 
During his investigation, Lt. Tucker sought the assistance of Noel Martin, a crime scene
investigator with the Smith County Sheriff's Office, to give his assessment of what likely
occurred at the scene. Martin concluded that Austin committed suicide and was probably
responsible for Nichole's death. However, Lt. Tucker had reservations about Martin's
opinion. Noting several inconsistencies with that conclusion, including the nature of
Austin's wound which indicated a non-contact wound, his experience that suicides typically
involve contact wounds, no visible blowback blood found on Austin's clothing, and no
apparent blood spatter on the walls or ceiling of Austin's room, Lt. Tucker believed that the
scene had been staged to look like a murder-suicide. He sought additional assistance from
Tom Bevel, a crime-scene reconstructionist, and Richard Ernest, a firearms expert.

 Bevel testified that the lack of blood on Austin's finger, his pants, and the floor nearby
was inconsistent with the theory that Austin committed suicide. In reviewing the crime scene
photographs, Bevel did not observe any of the forward spatter that would have originated
from the exit wound, and the amount of blood found on Austin's hand was greater than the
small amount he would have expected from blowback or blood spatter from the entry wound. 
The positioning of the gun when discovered, in his opinion, was inconsistent with having
been being fired at a 45-degree angle because the significant recoil of the rifle would have
caused the gun to "kick outward" against the hard surface found in Austin's room. Bevel
further testified that, based on the lack of blood in one location and lack of blood in the
carpet and on Austin's lower extremities, he would not expect the rifle to have been found
resting against the top of Austin's hand. 

 Through his test firing of the rifle and his observations of the soot and the spread of
gunpowder particles from the rifle when fired led Bevel to concluded that the rifle was eight
to ten inches from Austin's face when fired. Bevel also concluded that positioning the rifle
in a manner consistent with the trajectory of the bullet and holding the rifle no closer than
eight inches from the face, it would have been very difficult for Austin to fire the rifle using
his hand to manipulate the trigger based on his arm length. In his opinion, it would have
been impossible for Austin to fire the rifle in this manner holding the rifle beyond eight
inches. Further, the mechanical function of the rifle, namely having to press the safety and
pull the trigger to fire the rifle, added to the difficulty of firing from this eight- to ten-inch
range. Bevel discounted the theory that Austin could have fired the weapon using his toe to
depress the trigger. In previous cases where Bevel concluded this type of firing occurred,
he witnessed an indentation in the sock of the person caused by placing a toe in the trigger
guard. Bevel did not see any indentation in Austin's socks in the photographs taken at the
scene. Lastly, Bevel concluded that the evidence was more consistent with the theory that
Payne shot Nichole and Austin. He referred to the lack of evidence suggesting a third party's
presence in the house, the fact that there were no signs of a struggle or forced entry, the
temperature differences between the bodies, and the strong smell of gunpowder in Nichole's
room and the absence of it in Austin's room. 

 Richard Ernest, the State's firearm expert, concluded that the muzzle-to-target
distance was twelve inches, plus or minus two inches. He further opined that, based on the
length of the rifle, the trigger location, and the muzzle-to-target distance, for Austin to have
fired the rifle he would have had to hold the barrel while working the safety lever and trigger
with both feet or use a long device not found at the scene. While stopping short of claiming
that it would be impossible, he testified that it was unlikely that Austin shot himself. 

 Testifying for the defense, Noel Martin agreed with the State's witnesses that Nichole
was shot in the head with the recovered rifle from a distance of less than an inch away while
asleep in her bed. With respect to Austin, Martin testified that not only was it physically
possible for Austin to shoot himself with the rifle, but that Austin's death was indeed a
suicide. When Austin shot himself, Martin believed he was seated on the bed, holding the
rifle with his right hand at or near the muzzle with the rifle's butt end resting on the floor and
the rifle positioned at a 45-degree angle. And from his testing of the rifle, he opined that it
was possible for Austin to fire the rifle while positioning the muzzle four to eight inches
(plus or minus two inches) away from his face. Even though he believed Austin used his
hands to fire the rifle, Martin concluded that he could have used his foot and held the rifle
up to twenty inches away from his face. In his opinion, the rifle's safety mechanism did not
require a lot of pressure and was easily defeated. 

 Martin based his suicide conclusion on finding atomized blood on the carpet located
in front of Austin's body, the soot pattern found on Austin's face indicating an upward
trajectory, and a blood stain on Austin's thigh that appeared to strike his leg at a 90-degree
angle, which is consistent with Martin's theory of how Austin was positioned at the time the
gun was fired. Martin took issue with the State's theory that the scene was staged. First, he
noted that the blood found on the rifle and the lack of blood in other places was consistent
with the way the rifle was found and that it was not moved. Second, he testified that it is
impossible to tell where a rifle will end up after being fired. Third, he claimed that it was not
possible that Austin was shot in another location because the high-velocity blood spatter
found on his hand would be impossible to stage.

 Ed Hueske, Payne's firearms expert, also concluded that Austin shot himself with the
rifle while seated on the bed with his feet on the floor, but believed the muzzle-to-target
distance was between four and ten inches. From his dry-fire testing of the rifle, he too
concluded that Austin would have been able to fire the rifle manually or with his toe. 
Because a foot falling to the floor could straighten out a wrinkle or crease in a sock, Hueske
opined that the lack of a visible crease or wrinkle in Austin's sock did not rule out the
possibility that Austin fired the rifle with his toe. 

 The jury convicted Payne of capital murder, and because the State did not seek the
death penalty, he was sentenced to life imprisonment. He appealed, arguing that the evidence
was legally insufficient to support his conviction and that he was harmed by the trial court's
erroneous admission of several hearsay statements admitted through Sarah Hawthorne's
testimony. We granted review of these two issues which the court of appeals resolved
against him.II. Legal Sufficiency

 In finding the evidence sufficient, the court of appeals dismissed the State's
circumstantial evidence and focused exclusively on the forensic evidence both sides
presented. The court further focused its legal-sufficiency analysis on whether a jury could
have concluded that Austin did not shoot himself. After reviewing the forensic evidence, the
court determined that Payne's theory was implausible if not impossible. It found compelling
the State's expert testimony about the position of Austin's body which rebutted Payne's
theory of the shootings. The court stated:

 Taking this forensic evidence together, and viewing it in a light
favorable to the verdict, we hold that a rational jury could have concluded that
Austin did not take his own life. That determination flows fairly directly to the
conclusion that Appellant is the person who shot Nichole and Austin. There
were other possibilities: Austin could have shot Nichole and Appellant shot
Austin, or an unknown third party could have shot Austin or Nichole. But
once the jury concluded that Austin did not shoot himself, the conclusion that
Appellant shot them both is reasonable. (3) 

 While we agree with the court of appeals's judgment that the evidence is legally
sufficient, we find the analysis it used in arriving at its conclusion improper. The court of
appeals discounted the value of the State's circumstantial evidence when it found, for
instance, that "[t]he blood on the rag is not bright red, many married couples have life
insurance, the evidence is inconclusive as to whether the family was in any financial distress,
and [Payne's] denial of marital issues is neither surprising nor as unequivocal as the State
suggests it was." (4) By disregarding this evidence's potential probative value, the court of
appeals injected an inappropriate "divide-and-conquer" approach into its analysis and failed
to consider all of the evidence presented at trial. (5) After finding that the circumstantial
evidence was alone insufficient to support the verdict, the court of appeals framed the legal-sufficiency issue as "whether the jury could have concluded that the forensic evidence
showed that Austin did not shoot himself." (6) Framing the issue in this manner to incorporate
a defensive theory is reminiscent of the reasonable alternative hypothesis test long since
abandoned. (7) "[T]he relevant question is whether, after viewing the evidence in the light most
favorable to the prosecution, any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt." (8) Applying this standard to the offense charged in
this case, the question is whether any rational jury could have found that Payne intentionally
or knowingly caused the deaths of Nichole and Austin during the same criminal transaction. (9) 

 While we agree with the court of appeals's description of Payne's trial as "a contest
between two narratives" (10) told primarily through their respective experts' testimony, a proper
legal-sufficiency analysis does not permit a reviewing court to evaluate the evidence based
on which theory it views as more compelling. The proper standard accounts for the
factfinder's duty--the jury in this case-- "to resolve conflicts in the testimony, to weigh the
evidence, and to draw reasonable inferences from basic facts to ultimate facts." (11) Therefore,
in analyzing legal sufficiency, we "determine whether the necessary inferences are
reasonable based upon the combined and cumulative force of all the evidence when viewed
in the light most favorable to the verdict." (12) 

 "Our review of 'all of the evidence' includes evidence that was properly and
improperly admitted." (13) When the record supports conflicting inferences, we presume that
the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that
determination. (14) Direct and circumstantial evidence are treated equally: "Circumstantial
evidence is as probative as direct evidence in establishing the guilt of an actor, and
circumstantial evidence alone can be sufficient to establish guilt." (15)

 In viewing the evidence in the light most favorable to the jury's verdict, we find the
evidence is sufficient to sustain Payne's conviction. It was uncontested that there were no
signs of struggle or forced entry into the home and that the injuries Nichole and Austin
suffered were caused by or were consistent with Payne's rifle that was found standing
between Austin's legs. 

 In his recorded interview with law enforcement, Payne made several inculpatory
statements. Further, these statements demonstrate an attempt to conceal incriminating
evidence and contain implausible explanations of his conduct on the day of the murders. (16) 
First, Payne's recounting of the time line of the morning's events indicated that he had the
opportunity to shoot Nichole and Austin that morning. According to Payne, he returned
home from dropping his son off at school around 8:15 a.m. However, he did not call the
police to report the shooting until 9:09 a.m. When he discovered the bodies, he did not check
to see if they were alive or attempt to revive them. 

 Second, as the State asserted in its closing argument, Payne's explanation of his
conduct that morning was "illogical." Payne's explanations as to why he first turned around
to head into town for birdseed and then turned around again to tell Nichole that they were
going to the park were undermined by what he later did when he returned home. When he
finally returned home, he did not attempt to tell Nichole that they were going to the park, and
when he entered the house, he did so only to ask Nichole where the birdseed was located,
even though he claimed that they were out. 

 Third, based on other admitted evidence, the jury could rationally conclude that Payne
was purposely dishonest about his marital relationship and the couple's financial condition. 
Not only was the jury able to make an adverse credibility determination, there was evidence
to permit a jury to conclude that Payne had a motive and the intent to commit the crime in
that their marital relationship was unhappy, he made previous threats to kill Nichole, and they
were experiencing financial distress. The jury heard from witnesses who stated that Payne
did not want Nichole to have contact with her family, that Nichole told them she was very
unhappy in her marriage, that Payne had previously threatened to kill her, and that Nichole
told Hawthorne that she should "avenge" her death should anything happen to her. 
According to Payne, he and Nichole had an argument the night before her death. Also on the
night before her death, Nichole repeated her desire to obtain a divorce and claimed that
Payne threatened to kill her. 

 Payne's admission of the dwindling settlement proceeds, the overdrawn bank account,
the hurried sale of his boat at a loss, Payne's unemployment, postcards from Nichole to her
ex-husband asking for money, and the meager income from Nichole's bird business is
sufficient evidence from which a jury could conclude that the family was experiencing
financial pressure. While he was the beneficiary on Nichole's life insurance policy secured
approximately six months before her death, it was Payne's refusal to give a recorded phone
call concerning Nichole's and Austin's death that prevented him from collecting on
Nichole's insurance policy. A juror could properly infer that Payne's unwillingness to give
the insurance company a recorded statement suggested Payne's involvement in the deaths,
especially in light of the on-going police investigation which identified him as a potential
suspect. 

 Despite conflicting expert testimony, the jury also could have reasonably concluded
that the scene was staged to look like a murder-suicide. The State's experts concluded that
the scene was staged when considering the position of the rifle found near Austin, the nature
of Austin's wound, the type of weapon used, and the minimal amount and nature of the
biological material found near Austin. Even though witnesses noted alternative explanations
were possible, the lack of fingerprints on the recovered rifle was also consistent with the
State's theory that the weapon was wiped off before being placed in Austin's lap. Had
Austin fired the rifle, the State's forensic expert testified, he would have expected to find
Austin's fingerprints or some indication that the weapon had been handled. As described
previously, there was extensive, albeit conflicting, expert testimony concerning the muzzle-to-target distance and whether it was physically possible for Austin to fire the rifle from that
calculated distance. However, the resolution of conflicting witness testimony is rightly
within the province of the jury; we cannot sit as the proverbial "thirteenth juror." (17) When
confronted with conflicting theories and testimony, we defer to the jury's determination and
conclude that the jury must have resolved these conflicts in favor of its verdict. 

 While each piece of evidence lacks sufficiency when viewed in isolation, the totality
of the evidence, coupled with the reasonable inferences drawn from that evidence, is legally
sufficient to support Payne's capital murder conviction.

III. Nichole's Statements and Harmless Error

 The court of appeals found the following portions of Sarah Hawthorne's testimony
were inadmissible hearsay and erroneously admitted: (1) on the night before her murder,
Nichole said that Payne threatened to kill her; (2) Nichole stated that Payne threatened to kill
her in the past; and (3) Nichole stated that Payne threatened to burn her alive in the house and
begged Hawthorne to "avenge" her death should anything happen to her. (18) Finding these
errors harmless, the court of appeals stated that "the only plausible conclusion about the
evidence is that the jury concluded that Austin could not have shot himself based on the
physical evidence. In that context, the verdict rests on very substantial grounds and the
admission of Nichole's hearsay statements had little or no effect on the verdict." (19) 

 Payne maintains that, while it applied the correct harm analysis, the court of appeals 
erred in its conclusion that the admitted statements were harmless. In its reply brief, the State
claims that Payne failed to preserve this issue for appeal and, alternatively, the court of
appeals incorrectly held that admitting these portions of Hawthorne's testimony was
erroneous. However, the State did not raise these claims in a cross-petition for discretionary
review; therefore these issues are not before us for review. (20) Although error preservation is
a systemic requirement that a discretionary review court may address on its own motion if
warranted by the circumstances, we find no occasion to review the issue in this case in light
of the court of appeals's finding that the error was properly preserved. (21) Because we granted
review only to address the court of appeals's harm analysis on this issue, we assume, without
deciding, that the admission of these statements was error.

 Texas Rule of Appellate Procedure 44.2(b) provides that an appellate court must
disregard a non-constitutional error that does not affect a criminal defendant's "substantial
rights." (22) A substantial right is affected when the error had a substantial and injurious effect
or influence in determining the jury's verdict. (23) If the improperly admitted evidence did not
influence the jury or had but a slight effect upon its deliberations, such non-constitutional
error is harmless. (24) The question is not whether there was sufficient evidence to support the
verdict without the erroneously admitted evidence. (25) Instead, we must examine the entire
record and calculate the probable impact of the error upon the rest of the evidence. (26) 

 We disagree with both the court of appeals's harmless error analysis and its
conclusion. Like its legal-sufficiency analysis, the court of appeals improperly focused on
the jury's rejection of Payne's defensive theory that Austin shot himself and failed to
evaluate the entire record. While the totality of the evidence is legally sufficient to sustain
Payne's capital murder conviction, it was certainly not overwhelming. The jury's verdict was
primarily supported by the cumulation of arguably weak circumstantial evidence. There were
no eyewitnesses; nor was there forensic or direct evidence clearly linking Payne to the deaths.
In the absence of direct evidence, establishing Payne's motive to kill Nichole was a critical
component of the State's case. Hawthorne's testimony that Payne threatened to kill Nichole
in the past, that Nichole asked her to "avenge" her should anything happen, and that Payne
again threatened Nichole's life the night before her death were among the most inculpatory
pieces of the State's evidence. 

 This testimony was not merely cumulative of Nichole's fear of Payne, her unhappiness
in her marriage, and her desire to divorce him; it forcefully established Payne's motive and
intent to murder Nichole in a manner other evidence adduced at trial, including Nichole's
other statements, could not. Without the admitted statements, the State's motive and intent
theory relied upon the Paynes' unhappy marriage and Payne's desire to remedy his dire
financial condition with the proceeds of Nichole's life insurance policy. Unlike the argument
that the marriage was an unhappy one, the life insurance theory has ambiguous support in the
record. While the jury could have rationally inferred that Payne's desire for the insurance
proceeds was the motive for Nichole's murder, the inference is not a particularly strong one. 
Payne did not seek out life insurance for himself and Nichole; it was obtained in response to
a solicitation seven or eight months before Nichole's murder. Upon hearing about the deaths,
the insurance agent submitted the claim on his own initiative. There is no evidence that
Payne ever made a claim on Nichole's policy or that Payne asked the agent to submit the
claim on his behalf. Payne's refusal to give the insurance company a recorded statement
alone does not prove that he murdered Nichole for the insurance proceeds. 

 Nichole's statements that Payne had threatened to kill her directly established Payne's
motive unlike the State's other theories which required the jury to infer it. Further,
Hawthorne's powerful testimony that Nichole asked her to avenge her if something happened
to her in essence allowed Nichole to testify "from the grave" and relay her belief that, if
something were to happen, Payne would be responsible. Perhaps these statements would be
less compelling had they been made by someone other than the victim or if Payne had been
charged with a different offense. However, Payne's repeated threats to kill Nichole--one
of which was quite specific as to how he would kill her and another which occurred the night
before her death--and Nichole's request for vengeance played directly to an issue before the
jury--whether Payne intentionally or knowingly caused Nichole's death. Although it did not
belabor Nichole's statements, the State incorporated them into its closing argument and they
significantly supplemented its explanation as to why Payne killed Nichole. These statements
most likely had a telling effect upon the jury. 

 In light of the absence of direct evidence linking Payne to the deaths combined with
the statements' indelible character, it is likely that these statements influenced the jury's
assessment of the State's circumstantial evidence, the inferences drawn from that
circumstantial evidence, and its resolution of the considerable amount of conflicting "battle
of the experts"-type testimony in the State's favor. We therefore cannot conclude that
Hawthorne's testimony did not influence the jury or had but a slight effect upon its
deliberations. 

IV. Conclusion

 We affirm the court of appeals's judgment that the evidence is legally sufficient to
sustain Payne's capital murder conviction. However, we find that the court of appeals erred
in holding the admission of the statements harmless. Accordingly, we reverse the court of
appeals's judgment and remand to the trial court for a new trial.


DATE DELIVERED: February 27, 2013

DO NOT PUBLISH
1. Payne v. State, No. 12-10-00027-CR, 2011 WL 1662856, *5 (Tex. App.--Tyler,
April 29, 2011) (not designated for publication).
2. The record frequently refers to this victim as "Taylor." But the court of appeals's
opinion used the name "Austin." For consistency, we do as well.
3. Payne, 2011 WL 1662856, at *5.
4. Id.
5. See Merritt v. State, 368 S.W.3d 516, 527 (Tex. Crim. App. 2012).
6. Payne, 2011 WL 1662856, at *5.
7. See Laster v. State, 275 S.W.3d 512, 520-21, 522-23 (Tex. Crim. App. 2009).
8. Jackson v. Virginia
, 443 U.S. 307, 319 (1979) (emphasis omitted).
9. See Tex. Penal Code § 19.03(a)(7)(A) (West 2006).
10. Payne, 2011 WL 1662856, at *3.
11. Jackson, 443 U.S. at 319.
12. Hooper v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).
13. Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); Conner v. State,
67 S.W.3d 192, 197 (Tex. Crim. App. 2001).
14. Jackson, 443 U.S. at 326.
15. Hooper, 214 S.W.3d at 13.
16. See Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating that
"[a]ttempts to conceal incriminating evidence, inconsistent statements, and implausible
explanations to the police are probative of wrongful conduct and are also circumstances of
guilt.").
17. Brooks v. State, 323 S.W.3d 893, 899-902 (Tex. Crim. App. 2010). 
18. Payne, 2011 WL 1662856, at *7-8 (concluding that the statements were hearsay
and did not satisfy the exception found in Texas Rule of Evidence 803(3) ("Then Existing
Mental, Emotional, or Physical Condition")). 
19. Id. at *8.
20. See Batiste v. State, 888 S.W.2d 9, 10 n.1 (Tex. Crim. App. 1994); Haughton v.
State, 805 S.W.2d 405, 407 n.4 (Tex. Crim. App.1990); Keith v. State, 782 S.W.2d 861, 863
n.4 (Tex. Crim. App. 1989); Wilson v. State, 772 S.W.2d 118, 120 n.3 (Tex. Crim. App.
1989). 
21. See Jones v. State, 942 S.W.2d 1, 2 n.1 (Tex. Crim. App. 1997); Payne, 2011 WL
1662856, at *6, n.4.
22. Tex. R. App. Pro. 44.2(b) ("Other errors. Any other error, defect, irregularity, or
variance that does not affect substantial rights must be disregarded."); see Garcia v. State,
126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (applying Texas Rule of Appellate Procedure
44.2(b) to improperly admitted statements from deceased victim). 
23. Coble v. State, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).
24. Id.
25. See Bagheri v. State, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003).
26. Coble, 330 S.W.3d at 280.